# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CANOPY FINANCIAL, INC., | ) | Case No. 09-44943 |
| | ) | |
| Debtor. | ) | Hon. Eugene R. Wedoff |
| | ) | |

**ORDER, PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6003, 6004, 6006, 9007, AND 9008 AUTHORIZING AND APPROVING (A) SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND (B)  CERTAIN RELATED RELIEF**

Upon the motion (the "Debtor's Sale Motion")[1] of Canopy Financial, Inc., the above captioned debtor ("Debtor"), seeking entry of an order (a) scheduling an auction, sale hearing, and objection deadlines; (b) approving bidding procedures (the "Bidding Procedures"); (c) approving notice of the sale hearing; (d) authorizing and approving the sale ("Sale") of certain of Debtor's assets free and clear of liens, claims, rights, interests, charges, and encumbrances; and (e) authorizing the assumption and assignment of certain executory contracts (Dkt. No. 63); and this Court having entered an order approving Debtor's Sale Motion on December 23, 2009 (the "Original Procedures Order"); and upon the motion (the "Modification Motion," and together with Debtor's Sale Motion, the "Sale Motion") of Chapter 7 Trustee Gus A. Paloian ("Trustee"), not personally or individually but solely on behalf of the bankruptcy estate of Debtor, seeking entry of an Order (a) authorizing Trustee to sell substantially all of the assets (the "Assets") of Debtor and assume and assign certain executory contracts in conjunction with such sale (collectively, the "Transactions") and (b) modifying the Original Procedures Order (Dkt. No. 110); and the Court having entered an order approving the Modification Motion

---

[1]    Capitalized terms not defined herein shall have the meanings given to them in the Sale Motion, the Modification Motion, or the APA (as defined below).

(the "Modified Procedures Order" and together with the Original Procedures Order, the "Bid

Procedures Order") on January 27, 2010 (Dkt. No. 141); and the Court finding, as more fully set

forth below, that (i) Debtor and Trustee provided proper notice of (A) the deadlines and methods

for asserting objections to Debtor's Sale Motion, the Modification Motion, and the entry of this

Order and (B) the February 3, 2010, hearing on Debtor's Sale Motion and the Modification

Motion and the entry of this Order (collectively, the "Sale Hearing") to all parties entitled thereto

as required by applicable law and by the Bid Procedures Order, and no other or further notice of

any such matters is required and (ii) the appearances of all interested parties and all responses

and objections, if any, to the Sale Motion, and the entry of this Order have been duly noted in the

record of the Sale Hearing and such objections or responses have been withdrawn, otherwise

resolved, or overruled; the Court having considered (I) Debtor's Sale Motion and the

Modification Motion and the legal and factual bases set forth in support of each, (II) the form of

this Order submitted to the Court, (III) objections or other responses made to Debtor's Sale

Motion, the Modification Motion, and the entry of this Order, and (IV) the entire record of the

Sale Hearing, including any proffers of evidence submitted at or prior to the Sale Hearing; the

Court finding that the relief sought by the Sale Motion and contained in this Order is in the best

interest of Debtor, its estate, and its creditors; the Court being otherwise fully advised in the

premises, and after due deliberation and sufficient cause appearing therefor,

## THE COURT HEREBY FINDS AND DETERMINES THAT:

A.     The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to rule 7052 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy

Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale

Hearing in respect of the Sale Motion are hereby incorporated in this Order to the extent not

inconsistent herewith. To the extent that any of the following findings of fact constitute

conclusions of law, they are adopted as such. To the extent any of the following conclusions of

law constitute findings of fact, they are adopted as such.

### Jurisdiction, Final Order and Statutory Predicates

B.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this

District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory predicates for the relief requested in the Sale Motion are

sections 105 and 363 of the Bankruptcy Code, (ii) Bankruptcy Rules 2002, 6003, 6004, 6006,

9007, and 9008 and (iii) rule 9013-3 and 9013-4 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the Northern District of Illinois, Eastern

Division (the "Local Rules").

D.      The Purchased Assets constitute property of Debtor's estate and title

thereto is vested in Debtor's estate within the meaning of Section 541(a) of the Bankruptcy

Code.

E.      This Sale Order constitutes a final and appealable order within the

meaning of 28 U.S.C. § 158(a).

### Proper Notice and Compliance With Bidding Procedures

F.      On December 23, 2009, the Court entered the Original Procedures Order

which, among other things, (i) approved the Bidding Procedures for the Purchased Assets, (ii)

scheduled an auction date for the Purchased Assets (the "Auction") and the Sale Hearing; (iii)

established procedures relating to the assumption and assignment of the Purchased Contracts;

and approved the form and manner of the Notice of Auction and Sale Hearing (the "Sale

Notice") and Cure Notice. Debtor and its professionals complied with all the requirements of the Original Procedures Order.

G.    On January 20, 2010, the Court entered the Modification Order which, among other things, modified the Bidding Procedures and the procedures relating to the assumption and assignment of the Purchased Contracts.

H.    As evidenced by the certificates of service filed with this Court and the testimony or evidence proferred at the Sale Hearing, (a) on December 23, 2009, Debtor caused due and proper notice of the Sale Motion and the Sale Hearing to be mailed to (i) the Internal Revenue Service; (ii) all other applicable state and federal taxing authorities having jurisdiction over the Purchased Assets; (iii) the United States Department of Justice; (iv) the counterparties to the Purchased Contracts; (v) all other parties known to Debtor who have or may have asserted Interests (as defined below) in or against any of the Purchased Assets; (vi) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (vii) all other entities known to have expressed an interest in a transaction with respect to all or part of the Purchased Assets;; and (viii) the Office of the United States Trustee for the Northern District of Illinois (the "U.S. Trustee") (collectively, the "Notice Parties"), and (b) on December 21, 2009, Debtor caused the Sale Notice to be published in the Chicago Tribune, in accordance with the Bid Procedures Order.

I.    These notices (i) have been provided in accordance with Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008 and in compliance with the Bid Procedures Order and sections 105, 363 and 365 of the Bankruptcy Code, (ii) were good and sufficient, and appropriate under the particular circumstances, and reasonably calculated to reach and apprise all holders of Interests (as defined below) about the Bidding Procedures, the Auction, the Sale Hearing, the

APA and each of the Transactions, including, without limitation, the assumption and assignment

of the Purchased Contracts; and no other or further notice is or shall be required.

J.      As demonstrated by (x) the testimony and other evidence proffered or

adduced at the Sale Hearing and (y) the representations of counsel made on the record at the Sale

Hearing, Debtor, and after the conversion of the Bankruptcy Case, Trustee, afforded interested

potential purchasers a full and fair opportunity to qualify as bidders under the Bidding

Procedures and to submit an offer for the Purchased Assets and object to the relief requested in

the Sale Motion.

K.      The Auction was conducted in a non-collusive, fair and good faith manner

and a reasonable opportunity has been given to any interested party to make a higher and better

offer for the Purchased Assets.

L.      At the conclusion of the Auction, Trustee selected Canopy Acquisition,

LLC ("Purchaser") as the party that submitted the highest and best offer for the Purchased Assets

(the "Successful Bidder").  A copy of the Asset Purchase Agreement (the "APA") by and

between Purchaser and Trustee is attached hereto as **Exhibit 1**.

### Sound Business Purpose/Best Interests Of Creditors/Good Faith

M.      The Bidding Procedures set forth in the Bid Procedures Order were non-

collusive, in good faith, substantively and procedurally fair to all parties and were the result of

arm's length negotiations.

N.      As demonstrated by (x) the testimony and other evidence proffered or

adduced at the Sale Hearing and (y) the representations of counsel made on the record at the Sale

Hearing, (i) Debtor, and after the conversion of the Bankruptcy Case, Trustee, and their

professionals have complied, in good faith, in all respects with the Bid Procedures Order. and

(ii)  through marketing efforts and a competitive sale process conducted in accordance with the

Bid Procedures Order, Debtor, and after the conversion of the Bankruptcy Case, Trustee, (i) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase all of Debtor's assets, and (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets.

O.      Purchaser is the Successful Bidder for the Purchased Assets in accordance with the Bid Procedures Order.  The Bidding Procedures obtained the highest value for the Purchased Assets for Debtor and its estate.

P.      As demonstrated by (x) the testimony and other evidence proffered or adduced at the Sale Hearing and (y) the representations of counsel made on the record at the Sale Hearing, (i) Purchaser is not an "insider" of Debtor as that term is defined in the Bankruptcy Code; (ii) the APA was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind; and (iii) neither Trustee nor Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of or implicate section 363(n) of the Bankruptcy Code to the APA or to the consummation of the sale transaction and transfer of the Purchased Assets. Based on the foregoing, Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code with respect to all of the Purchased Assets.  Purchaser is entitled to all of the protections and immunities of section 363(m) of the Bankruptcy Code.

Q.      As demonstrated by (x) the testimony and other evidence proffered or adduced at the Sale Hearing and (y) the representations of counsel made on the record at the Sale Hearing, the offer of Purchaser, upon the terms and conditions set forth in the APA, including

the form and total consideration to be realized by Debtor pursuant to the APA, (i) is the highest and best offer received by Debtor; (ii) is fair and reasonable; (iii) is in the best interests of Debtor's creditors and estate; (iv) constitutes full, fair and adequate consideration and reasonably equivalent value for the Purchased Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia; and (v) will provide a greater recovery for Debtor's creditors and other interested parties than would be provided by any other practically available alternative.

R.      Trustee has demonstrated a sufficient basis and compelling circumstances requiring it to enter into the APA and sell the Purchased Assets under sections 363 of the Bankruptcy Code, and such action is an appropriate exercise of Trustee's business judgment and in the best interests of Debtor, its estate and its creditors.  As more fully set forth in the Sale Motion and as demonstrated by (x) the testimony and other evidence proffered or adduced at the Sale Hearing and (y) the representations of counsel made on the record at the Sale Hearing, such business reasons include, but are not limited to, the facts that (i) there is substantial risk of deterioration of the value of the Purchased Assets if the Sale or Transactions are not consummated quickly; (ii) the APA constitutes the highest and best offer for the Purchased Assets; (iii) the APA and the Closing (as defined in the APA) will present the best opportunity to realize the value of Debtor on a going concern basis and avoid decline and devaluation of Debtor's business; and (iv) creditors' recoveries may be diminished unless the Sale or Transactions are concluded expeditiously as provided for in the Sale Motion and pursuant to the APA.

S.      Trustee has full corporate power and authority to execute the APA and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and

validly authorized by all necessary corporate authority by Trustee to consummate the Transactions.

### Validity and Free and Clear Nature of Transfers

T.      On January 25, 2010, this Court entered an order (Dkt. No. 132) authorizing the Trustee to merge Debtor's wholly owned subsidiary Caregain, Inc., into Debtor, with Debtor as the surviving entity (the "*Merger*").  Such Merger is an express condition precedent to the transactions contemplated hereby, and Purchaser would not consummate the transactions contemplated hereby without such prior Merger.  All findings of fact and conclusions of law stated herein shall be deemed to have issued immediately following the consummation of the Merger.

U.      Debtor is the sole and lawful owner of the Purchased Assets.  Trustee, for and on behalf of Debtor, has (i) full corporate power and authority to execute the APA and all other documents contemplated thereby, and the sale of the Purchased Assets by Trustee has been duly and validly authorized, (ii) all of the corporate power and authority necessary to consummate the Transactions, and (iii) taken all action necessary to authorize and approve the APA and the consummation by Debtor of the transactions contemplated thereby. Notwithstanding any requirement for approval or consent by any person, Trustee's transfer of the Purchased Assets to Purchaser is a legal, valid and effective transfer of the Purchased Assets.

V.      Except for the Assumed Liabilities (as such term is defined in section 2.3 of the APA), the transfer of the Purchased Assets to Purchaser will vest Purchaser with all right, title, and interest of Debtor to the Purchased Assets free and clear of all liens, claims, encumbrances or interests of any kind or nature (collectively, the "Interests"), including, but not limited to those arising under or relating to: (1) any right or option to effect any forfeiture, modification, right of first refusal or termination of Debtor's or Purchaser's interest in the

Purchased Assets, or any similar rights; (2) any right, title, or interest any of Debtor's intellectual

property, including that property deposited into escrow with any third party; (3) taxes arising

under or out of, in connection with, or in any way relating to the operation of the Purchased

Assets prior to the Closing, (4) any employment or labor agreements; (5) any pension, welfare,

compensation, or other employee benefit plans, agreements, practices, and programs, including,

without limitation, any pension plan of Debtor; (6) any other employee, worker's compensation,

occupational disease, or unemployment or temporary disability related claim, including without

limitation claims that might otherwise arise under or pursuant to (A) the Employee Retirement,

Income, Security Act of 1974, as amended, (B) the Fair Labor Standards Act, (C) Title VII of the

Civil Rights Act of 1964, (D) the Federal Rehabilitation Act of 1973, (E) the National Labor

Relations Act, (F) the Worker Adjustment and Retraining Act of 1988, (G) the Age

Discrimination and Employee Act of 1967, or (H) the Consolidated Omnibus Budget

Reconciliation Act of 1985; (7) any products liability or similar claims, whether pursuant to any

state or federal laws or otherwise; (8) any environmental claims or Liens arising from conditions

first existing on or prior to the Closing (including, without limitation, the presence of hazardous,

toxic, polluting, or contaminating substances or waste) that may be asserted on any basis,

including, without limitation, under the Comprehensive Environmental Response,

Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. or similar state statute; (9) any bulk

sales or similar law; (10) any tax statutes or ordinances, including, without limitation, the

Internal Revenue Code of 1986, as amended; (11) any mortgages, deeds of trust, security

interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands,

encumbrances, rights of first refusal or charges of any kind or nature, if any, including, but not

limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any

attributes of ownership; and (12) any debts arising in any way in connection with any

agreements, acts, or failures to act, of Debtor or any of Debtor's predecessors or affiliates, claims

(as that term is defined in the Bankruptcy Code), obligations, liabilities, demands, guaranties,

options, rights, contractual or other commitments, restrictions, interests and matters of any kind

and nature, whether known or unknown, contingent or otherwise, whether arising prior to or

subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement,

understanding, law, equity or otherwise, including but not limited to claims otherwise arising

under doctrines of successor.

      W.    Purchaser would not have entered into the APA and would not

consummate the transactions contemplated thereby, thus adversely affecting Debtor, its estate

and its creditors, if the sale of the Purchased Assets to Purchaser, and the assumption of the

Assumed Liabilities by Purchaser were not, except as otherwise provided in the APA, free and

clear of all Interests of any kind or nature whatsoever, or if Purchaser would, or in the future

could, be liable for any of the Interests.

      X.    Trustee may sell the Purchased Assets free and clear of all Interests of any

kind or nature whatsoever because, in each case, one or more of the standards set forth in

section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Interests who

did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to

have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Interests

who did object fall within one or more of the other subsections of section 363(f) of the

Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the cash

proceeds of the Sale ultimately attributable to the property against or in which they claim an

Interest.

**NOW THEREFORE, THE COURT HEREBY ORDERS, ADJUDGES, AND DECREES AS FOLLOWS:**

### General Provisions

1.      The Sale Motion is granted.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled and all reservations of rights included in such objections are overruled on the merits.

### Approval of the APA

3.      The APA, and all of the terms and conditions thereof, is hereby approved in its entirety.  The failure to specifically include any provisions of the APA in this Order shall not impair the effectiveness of any such provisions.

4.      Pursuant to section 363(b) of the Bankruptcy Code, Trustee is authorized to perform its obligations under and comply with the terms of the APA, and consummate the Transactions, pursuant to and in accordance with the terms and conditions of the APA.

5.      Trustee is authorized and directed to execute and deliver, and empowered to perform under, consummate and implement, the APA, together with all additional instruments and documents that Trustee or Purchaser deem necessary or appropriate to implement the APA and effectuate the Transactions, and to take all further actions as may be requested by Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to Purchaser or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.

### Transfer of Assets Free and Clear of Claims and Interests

6.      Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets (other than the assignment of the Purchased

Contracts to Purchaser, which remains subject to further order of this Court) shall be transferred to Purchaser, and upon the Closing of the Sale shall be, free and clear of all Interests of any kind or nature whatsoever (including, but not limited to, those expressly described in paragraph V of this Order), and all such Interests of any kind or nature whatsoever shall attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to any claims and defenses Debtor may possess with respect thereto. Any provision in any agreement which constitutes part of the Purchased Assets that purports to restrict the transfer of such asset as a result of a change in control is hereby deemed unenforceable and all such agreements shall be conveyed to Purchaser, and Purchaser shall enjoy all rights and privileges under such agreements.

7.      Except as otherwise expressly provided in the APA, Purchaser shall have no obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of Debtor. Except as otherwise expressly provided in the APA, Purchaser shall have no liability with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which Debtor is a party and relating to the Purchased Assets (including, without limitation, arising from or related to the rejection or other termination of any such agreement), and Purchaser shall in no way be deemed a party to or assignee of any such agreement, and no employee of Purchaser shall be deemed in any way covered by or a party to any such agreement, and except for Assumed Liabilities, all parties to any such agreement are hereby enjoined from asserting against Purchaser any and all claims arising from or relating to such agreement. Purchaser shall have no duties, responsibility or liability to give notices, if any,

required to be given to Debtor's employees pursuant to the Worker Adjustment and Retraining Notification Act, or any similar federal or state law.

8.    This Order (a) shall be effective as a determination that, except for the Assumed Liabilities, at Closing, all Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

9.    On the Closing of the Sale, Debtor's creditors and any other holder of an Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

10.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens or other documents or agreements evidencing Interests in Debtor or the Purchased Assets shall not have delivered to Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all Interests which the person or entity has with respect to Debtor or the Purchased Assets or otherwise, then (a) Trustee is hereby authorized and directed to execute and file such

statements, instruments, releases and other documents on behalf of the person or entity with

respect to Debtor or the Purchased Assets and (b) Purchaser is hereby authorized to file, register

or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of

the release of all Interests in Debtor or the Purchased Assets of any kind or nature whatsoever.

### Assumption and Assignment
### to Purchaser of the Purchased Contracts

11.     The assumption by the debtor and assignment to Purchaser of any

executory contract and unexpired lease shall be pursuant to separate order of this Court in

accordance with the Modified Procedures Order.  Notwithstanding any to the contrary in the

APA or herein, Purchaser shall not be liable for any Liabilities associated with a Purchased

Contract (as defined in the APA) except as set forth in the APA and unless and until this Court

enters an order in accordance with the terms of the Modified Procedures Order.  Purchaser shall

be entitled to remove from Schedule 2.1(c) to the APA any Proposed Contract at any time prior

to the conclusion of the hearing on the Assumption and Assignment Motion (the "Assignment

Hearing"), at no cost or expense to Purchaser.  To the extent Purchaser removes a Contract from

Schedule 2.1(c) in advance of the Assignment Hearing, Purchaser shall give Seller notice of such

removal in writing.  To the extent Purchaser removes a Purchased Contract from Schedule 2.1(c)

during the Assignment Hearing, counsel for Seller or Purchaser shall give such notice of such

removal on the record during the Assignment Hearing.  Seller, through counsel, shall disclose the

terms and conditions of this Paragraph 11 and of Section 2.1(c) of the APA in the Cure Notice

(as defined in the Modified Procedures Order) and on the record at the beginning of the

Assignment Hearing to the extent any counterparty to a Purchased Contract appears at such

hearing.

### Additional Provisions

12.    Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions.

13.    Subject to any express provisions of the APA, any amounts that become payable by Trustee or Debtor to Purchaser pursuant to the APA (and related agreements executed in connection therewith, including, but not limited to, any obligation arising under the APA) (a) shall constitute administrative expenses of Debtor's estate under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code and (b) shall be paid by Trustee in the time and manner provided for in the APA without further order of this Court.

14.    All entities who are in possession of some or all of the Purchased Assets on the Closing are hereby directed to surrender possession of the Purchased Assets to Purchaser at Closing.

15.    This Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the APA, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed by or to Trustee, (c) resolve any disputes arising under or related to the APA, or the breach of the APA as provided in section 11.5 of the APA, except as otherwise provided therein, (d) interpret, implement and enforce the provisions of this Order and (e) protect Purchaser against (i) any of the Excluded Liabilities or (ii) the assertion of any Interests against the Purchased Assets, of any kind or nature whatsoever.

16.     The Transactions are undertaken by Purchaser and Trustee without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the Transaction (including the assumption and assignment of any of the Purchased Contracts), unless such authorization is duly stayed pending such appeal.

17.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on Debtor's estate.

18.     This Order and the APA shall be binding in all respects upon all creditors of and equity interests in Debtor (whether known or unknown), any holders of Interests, all successors and assigns of Purchaser, Debtor and its Affiliates and subsidiaries, the Purchased Assets, the Trustee, and any subsequent trustees appointed in Debtor's chapter 7 case and shall not be subject to rejection.  Nothing contained in any other order in this case shall conflict with or derogate from the provisions of the APA or this Order.

19.     The provisions of this Order are non-severable and mutually dependent and, pursuant to Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for 10 days and shall be effective immediately upon entry.

**[Intentionally Left Blank]**

20.    Trustee and Purchaser may consummate the Transactions at any time after

entry of this Order by waiving any and all closing conditions set forth in the APA that have not

been satisfied and by proceeding to close the Sale without any notice to the Court and/or any

party in interest.

Dated:  Chicago, Illinois
        February 3, 2010

HON. EUGENE R. WEDOFF
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

(Execution Copy)

## ASSET PURCHASE AGREEMENT

### BETWEEN

### CANOPY ACQUISITION, LLC,

### PAYFLEX SYSTEMS USA, INC.,
### SOLELY FOR PURPOSES OF
### SECTION 8.12 HEREOF,

### AND

### GUS A. PALOIAN, NOT PERSONALLY OR
### INDIVIDUALLY BUT SOLELY AS CHAPTER 7
### TRUSTEE ON BEHALF OF THE BANKRUPTCY
### ESTATE OF CANOPY FINANCIAL, INC.

### DATED AS OF FEBRUARY 2, 2010

CHI 11896983.5

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of February 2, 2010 (this "Agreement"), by and among Canopy Acquisition, LLC, a Delaware limited liability company ("Purchaser"), PayFlex Systems USA, Inc., a Nebraska corporation ("Parent"), solely for purposes of Section 8.12 hereof, and Gus A. Paloian, not personally or individually but solely as Chapter 7 trustee ("Trustee" or "Seller") on behalf of the bankruptcy estate of Canopy Financial, Inc., a Delaware corporation (after giving effect to the CareGain Merger (as defined below), "Debtor").

## RECITALS

WHEREAS, Debtor is in the business of providing technology-enabled electronic payment, account management, and investment technology platforms for health savings accounts, flexible spending accounts, and health reimbursement arrangements (collectively, the "Business");

WHEREAS, Debtor filed a voluntary petition for relief (the "Petition") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court"), captioned In re Canopy Financial, Inc., Case No. 09-44943 (the "Bankruptcy Case");

WHEREAS, on December 20, 2009, Debtor filed a Motion for Orders (A) Scheduling an Auction, Sale Hearing, and Objection Deadlines; (B) Approving Bidding Procedures; (C) Approving Notice of the Sale Hearing; (D) Authorizing and Approving the Sale of Certain of Debtor's assets Free and Clear of Liens, Claims, Rights, Interests, Charges, and Encumbrances; (E) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (F) Authorizing Debtor to Enter into a Transition Services Agreement with the Proposed Purchaser (the "Bid Procedures Motion" or "Sale Motion");

WHEREAS, the Bankruptcy Court approved the Bid Procedures Motion by order on December 28, 2009 (the "Original Procedures Order"), whereby, among other things, the Court scheduled an auction for the sale of Debtor's assets, scheduled a hearing to consider approving the sale of such assets, and approved certain procedures for the conduct of the proposed auction and sale;

WHEREAS, on December 30, 2009, the Bankruptcy Court entered an order converting the Debtor's Bankruptcy Case from Chapter 11 to Chapter 7, and on December 30, 2009, the U.S. Trustee appointed Gus A. Paloian as Chapter 7 trustee in the Bankruptcy Case;

WHEREAS, on January 14, 2010, Trustee filed a Motion (I) For Authority To Sell Substantially All Of The Assets Of Debtor And Assume And Assign Certain Executory Contracts In Conjunction With Such Sale And (II) To Modify Order (A) Scheduling An Auction, Sale Hearing, And Objection Deadlines; (B) Approving Bidding Procedures; And (C) Approving Notice Of The Sale Hearing (the "Modification Motion");

WHEREAS, on January 20, 2010, the Bankruptcy Court entered a Modified Order (A) Scheduling an Auction, Sale Hearing, and Objection Deadlines; (B) Approving Bidding Procedures; and (C) Approving Notice of the Sale Hearing (the "Modified Procedures Order");

WHEREAS, on January 27, 2010, Trustee filed a Motion, among other things, seeking entry of an order modifying the Modified Procedures Order (the "Second Modification Motion");

WHEREAS, on January 27, 2010, the Bankruptcy Court entered a Second Modified Order (A) Scheduling an Auction, Sale Hearing, and Objection Deadlines; (B) Approving Bidding Procedures; and (C) Approving Notice of the Sale Hearing (the "Second Modified Procedures Order"), pursuant to which the Trustee has the authority to enter into this Agreement;

WHEREAS, on February 2, 2010, Seller held the Auction (as defined herein) in accordance with the Second Modified Procedures Order and during the Auction, Seller designated Purchaser as the "Successful Bidder" (as defined in the Second Modified Procedures Order);

WHEREAS, Trustee now desires to enter into this Agreement with Purchaser;

WHEREAS, subject to the terms and conditions set forth herein and the approval by the Bankruptcy Court of the agreement set forth herein and above, Seller is agreeing to sell the Purchased Assets in accordance with sections 105 and 363 of the Bankruptcy Code and to assume and assign the Purchased Contracts (if any) in accordance with section 365 of the Bankruptcy Code;

WHEREAS, Purchaser is agreeing to purchase the Purchased Assets and assume only the Assumed Liabilities (if any), all on the terms and conditions set forth herein; and

WHEREAS, Purchaser is a direct or indirect wholly-owned subsidiary of Parent and Parent will derive substantial benefit from the transactions contemplated by this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Certain Definitions.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1 or in other Sections of this Agreement, as identified in the chart in Section 1.2:

"Affected Equipment" has the meaning set forth in Section 4.1(a).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or

2

cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Assignment and Assumption Agreement" has the meaning set forth in Section 4.1(a)(ii).

"Assignment of Intellectual Property" has the meaning set forth in Section 4.1(a)(iii).

"Assignment Order" means an order of the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code, providing for the assignment by Seller to Purchaser and the assumption by Purchaser of the Purchased Contracts.

"Avoidance Actions" means all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof.

"Auction" has the meaning ascribed to it in the Second Modified Procedures Order.

"Bankruptcy-Related Fees" means any fees and expenses (including out of pocket expenses) incurred by or otherwise due (whether or not billed and regardless of when incurred or accrued) that are related to Debtor's Chapter 11 and/or Chapter 7 Bankruptcy Case, as the case may be, or Debtor's and Trustee's sale efforts, including the fees and expenses for any of the following: (i) Trustee in the Bankruptcy Case; (ii) counsel for Debtor or Trustee; (iii) financial advisors to Debtor or Trustee; (iv) any professional retained in the Bankruptcy Case; and (v) any employee of Debtor for any transaction or retention bonuses or other similar obligation. For the avoidance of doubt, Bankruptcy-Related Fees do not include any fees and expenses incurred by Purchaser.

"Bill of Sale" has the meaning set forth in Section 4.1(a)(i).

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Caregain" means Debtor's Caregain software platform and product line, including but not limited to all Software, Hardware, technology, proprietary design features and architecture, Intellectual Property, source codes, equipment, data, records, website and userface capabilities, and information associated therewith.

"CareGain Merger" means the merger, pursuant to the Delaware General Corporation Law, of CareGain, Inc., a Delaware corporation and wholly owned subsidiary of Debtor, with and into Debtor, which such merger shall have been recognized by the filing of a Certificate of Merger by the Delaware Secretary of State (the "Certificate of Merger").

"Cash Consideration" has the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended.

3

"Confidential Information" means any and all technical, business and other information of or relating to the Business or Debtor's assets, including trade secrets, that derives value, actual, potential, economic or otherwise, from not being generally known to other Persons, including technical or non-technical data, Software, compositions, devices, methods, techniques, drawings, inventions, processes, financial data, financial plans, product plans, information related to pricing of products, service levels, fee structures and/or any aspect of cost structure, information relating to test data, database design, operational methods, proposed transactions or contractual undertakings, lists of, or information relating to, actual or potential customers or vendors, acquisition and investment plans and strategies, business plans or operations of the Business. Confidential Information includes: (i) information contained in any books and records, the originals of which are retained by Seller pursuant to Section 2.2(f), to the extent otherwise satisfying the definition of Confidential Information and (ii) information of third parties that Seller is obligated to or does keep or treat as confidential.

"Contract" means any contract written or oral, indenture, note, bond, lease or other agreement.

"Cure Amount" means all amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under a Contract.

"Documents" means all of Debtor's files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related directly to the Business and the Purchased Assets in each case whether or not in electronic form.

"Domain Name Assignment" has the meaning set forth in Section 4.1(a)(iv).

"Estate Claims" include any and all rights, claims (including, without limitation, any "claim" as defined in section 101(5) of the Bankruptcy Code), causes of action, cross-claims, contribution claims, subrogation claims, reimbursement claims, indemnity claims, and other similar claims, demands, or allegations, whether in the nature of or sounding in tort, or under contract, warranty, guarantee, contribution, joint and several liability, fraud, subrogation, reimbursement, or indemnity, or any other theory of law or equity, that the Debtor or its bankruptcy estate may have against any Person, other than the Purchaser's Rights (as hereinafter defined). "Estate Claims" include but expressly are not limited to: (1) causes of action arising under the Bankruptcy Code, including but not limited to claims and causes of action arising under chapter 5; (2) claims against any Person relating in any way to the misappropriation, misuse, or other action taken with respect to (or failure to act with respect to) funds or their proceeds that were supposed to be maintained in trust, custodial or similar accounts; (3) claims arising out of or relating to any shareholder redemptions, dividends, distributions or similar payments; (4) claims against any officers, directors, employees, contractors, agents or professionals of the Debtor; (5) claims against any Person relating in any way to the misappropriation, theft or other misuse of the Debtor's funds or other property; (6) any claims to

4

or against any insurance policies maintained for the benefit of the Debtor, its officers or directors, or creditors, or the proceeds thereof; (7) claims against any lawyers, accountants, financial advisors, investment banks, professional firms or similar entities that provided services to the Debtor, or provided services in connection with any transactions involving the Debtor; (8) claims derivative of the Debtor; (9) claims for assisting or aiding and abetting any of the foregoing conduct; and (10) claims relating to any assets of the Debtor or its creditors, or proceeds of such assets, seized or held by any Person, including but not limited to assets frozen, seized or held by any Governmental Body.

"Final Order" means an means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review, reconsideration, amendment, modification, stay or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review, reconsideration, amendment, modification, stay or rehearing is pending; or (ii) if an appeal, writ of certiorari, or motion for re-argument, reconsideration, amendment, modification, stay or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or re-argument, reconsideration, amendment, modification, stay or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further re-argument or rehearing has expired.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements and other tangible personal property owned by Debtor, including all artwork, desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, except for the items described in Schedule 1.1(a).

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the specified period and the immediately prior comparable period.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Health Direct" means Debtor's Health Direct software platform and product line, including but not limited to all Software, Hardware, technology, proprietary design features and architecture, Intellectual Property, source codes, equipment, data, records, website and userface capabilities, and information associated therewith.

"Infrastructure" means technology systems and infrastructure owned by Debtor, including, without limitation, middleware, servers, workstations, routers, and all other information technology Software or equipment.

"IRS" means the Internal Revenue Service.

5

"Intellectual Property" means any and all: (a) registered and unregistered trade names, trademarks, service marks, trade dress, logos, business and product names, packaging, slogans, Internet domain names, and the goodwill associated with all of the foregoing; (b) patent applications and patents, including without limitation any provisional or non-provisional patent applications, including any divisional patent applications, continuation patent applications and continuation-in-part patent applications, any issued, reissued, or reexamined patents, the foreign equivalents of any such patent applications or patents, and any other patent applications or patents claiming the benefit of the filing date of any such patent applications or patents or their foreign equivalents; (c) copyrights and copyrightable works; (d) Software; (e) inventions and discoveries, processes, designs, formulae, algorithms, financial and other models, trade secrets, know-how and other Confidential Information, including business and technical information, whether or not patentable or copyrightable, including, without limitation, web site user information, customer and supplier lists and related information, pricing and cost information, business and marketing plans, advertising statistics and any other financial, marketing and business data, technical data, specifications and know-how; (f) any applications for any of the foregoing; (g) any other proprietary, intellectual property or similar right; and (h) any rights given to the owner of any of the foregoing, including common law rights, rights to exclude others from appropriating any of such rights, the right to sue for and obtain remedies against past, present and future infringements or misappropriations of any or all of the foregoing and rights of priority and protection of interests therein.

"Key Employees" means the key support and technology employees of Debtor listed on Schedule 9.1(f).

"Knowledge of Seller" means the actual knowledge of Seller, after reasonable inquiry of the persons listed on Schedule 1.1(b).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, interest, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any right of a third party in respect of an asset of such Person.

"Modified Procedures Order" has the meaning ascribed to it in the recitals.

"Malware" means any harmful surreptitious software code or other contaminants (including commands, instructions, devices, techniques, bugs, web bugs, works, logic bombs, Trojan horses, backdoors, trapdoors or design flaws), that may be used to wrongfully access, alter, delete, threaten, infect, assault, vandalize, disrupt, damage, disable or shut down such

Software, or any other systems, databases, software or hardware used in connection with such Software.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Petition Date" means November 25, 2009.

"Products" means any and all products developed, manufactured, marketed or sold by Debtor.

"Purchased Contracts" means all Contracts listed on Schedule 2.1(c), to the extent approved by the Bankruptcy Court pursuant to the Assignment Order prior to Closing, subject to Section 2.1(c).

"Purchased Intellectual Property" means all Intellectual Property owned by Debtor, or licensed by Debtor under a Purchased Contract, including, without limitation, all Intellectual Property owned by Debtor that is incorporated in, used in the development of, or otherwise related to the Software Platforms (including, for the avoidance of doubt, the Software Platforms to the extent owned by Debtor).

"Purchaser Material Adverse Effect" means a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

"Sale Hearing" has the meaning ascribed to it in the Second Modified Procedures Order.

"Sale Order" means the Order, attached hereto as Exhibit A, pursuant to Sections 105(a) and 363 of the Bankruptcy Code approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby. Any material changes to draft of the Sale Order attached hereto as Exhibit A must be reasonably acceptable to the Purchaser.

"Second Modified Procedures Order" has the meaning ascribed to it in the recitals.

"Seller Material Adverse Effect" means any change, development or effect that has had, or would reasonably be expected to have, individually or in the aggregate with all other changes, developments or effects, a material adverse effect on the Purchased Intellectual Property, or on Purchaser's use or ownership thereof. For the avoidance of doubt, any release of the source code

7

underlying the Software purchased hereunder as part of the Purchased Intellectual Property, except as provided in Schedule 1.1(c), shall be deemed a "Seller Material Adverse Effect."

"Software" means, (i) except to the extent generally available for purchase from a third Person, any and all (a) applications programs, operating system software, computer software languages, utilities and other computer programs (*i.e.*, any set of statements or instructions to be used directly or indirectly in a computer to bring about a certain result), including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, used or developed in connection with the foregoing, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, related to any of the foregoing, and (e) all documentation including user manuals and other training documentation related to any of the foregoing, (ii) the tangible media upon which any of the foregoing are recorded or printed, and (iii) all corrections, improvements, updates and releases of any of the foregoing.

"Software Platforms" means Health Direct and Caregain.

"Tax Authority" means any government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, workers' compensation, customs duties, registration, documentary, occupation, real and personal property and estimated taxes, (ii) any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code or any predecessor or successor thereof or any analogous or similar provision under state, local, or foreign law, or by contract, assumption, indemnity or otherwise, and (iii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i) or (ii).

"Tax Return" means all returns, declarations, reports, estimates, filings, information returns and statements required to be filed in respect of any Taxes (including any schedules, exhibits, or attachments thereto or amendments thereof).

   1.2    Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| Agreement | Recitals |
| Approved Cure Amount | 2.1(c) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |

8

| Term | Section |
| --- | --- |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Cash Consideration | 3.1 |
| Closing | 4.1 |
| Closing Conditions | 4.1 |
| Closing Date | 4.1 |
| Company | Recitals |
| Cure Amount Schedule | 2.1(c) |
| Competing Transaction | 7.2(a) |
| Deposit Amount | 3.2 |
| Escrow Agent | 3.2 |
| Escrow Agreement | 3.2 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Modification Motion | Recitals |
| Necessary Consent | 2.6 |
| Parent | Recitals |
| Petition | Recitals |
| Purchased Assets | 2.1(b) |
| Purchase Price | 3.1 |
| Purchaser | Recitals |
| Representatives | 7.2(b) |
| Second Modification Motion | Recitals |
| Seller | Recitals |
| Solicitation Period | 7.2(a) |
| Termination Date | 4.2(a) |
| Transfer Taxes | 10.1 |
| Transition Contracts | 8.13 |
| Transition Period | 8.13 |

1.3    Other Definitional and Interpretive Matters. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b)    Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

(c)    Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

9

(d)    Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e)    Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f)    Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(g)    Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

1.4    No Presumption.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

**ARTICLE II**
**PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES**

2.1    Purchase and Sale of Assets.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller, for and on behalf of Debtor's bankruptcy estate, shall sell, transfer, convey and deliver to Purchaser, all of Debtor's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than those created by Purchaser claims and interests).

(b)    For all purposes of and under this Agreement, the term "Purchased Assets" shall mean solely the following properties, assets and rights of Debtor existing as of the Closing, real or personal, tangible or intangible and whether or not related to the Business:

(i)    the Purchased Intellectual Property, excluding Debtor Licensed IP;

(ii)    all Infrastructure of Debtor relating to the Software Platforms, including, without limitation, any and all Infrastructure of Debtor relating to Debtor's business continuity/disaster recovery plan;

(iii)    all Furniture and Equipment, including, without limitation, the assets of Debtor listed on Schedule 2.1(b)(iii);

(iv)    the Purchased Contracts, if any;

(v)    to the extent not included in the Purchased Intellectual Property, all rights of Debtor in and to trademarks, service marks, trade names (including, without limitation, the name "HSA Insider"), service names, brand names, all trade dress rights, logos, and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof;

(vi)    all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Purchased Intellectual Property or the Purchased Contracts, but excluding any Documents exclusively related to an Excluded Asset;

(vii)    all Permits used by Debtor in connection with the Purchased Assets to the extent assignable;

(viii)    to the extent assignable, all rights of Debtor under stand-alone non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Debtor or with third parties to the extent relating to the Purchased Assets (or any portion thereof) (for the avoidance of doubt, all non-disclosure, confidentiality, non-compete or non-solicitation agreements contained within employment agreements or otherwise not "stand-alone" agreements or which are otherwise non-assignable shall be Excluded Assets and any Liabilities associated therewith shall be Excluded Liabilities which shall be retained by Debtor);

(ix)    all rights of Debtor under assignment of inventions agreements and/or patent assignment agreements related to the Purchased Intellectual Property, including the right to sue for patent infringement;

(x)    any rights, claims or causes of action of Debtor against third parties relating to the Purchased Intellectual Property and/or the Purchased Contracts arising out of events occurring on or prior to the Closing Date;

(xi)    all rights of Debtor under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to the Purchased Intellectual Property or to the extent affecting any Purchased Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(xii)    all of Debtor's goodwill associated with the Purchased Intellectual Property and/or the Purchased Contracts; and

(xiii)    all right, title and interest in and to any copyrights in any of the Purchased Intellectual Property, including the right to sue for infringement.

(c)    At any time prior to 5:00 p.m., Chicago time, on February 4, 2010, Purchaser may (i) add to Schedule 2.1(c) or remove from Schedule 2.1(c) any Contract to which Debtor is a party or (ii) designate other additional Excluded Assets by giving reasonably detailed written notice thereof to Seller, provided that Purchaser may not add to Schedule 2.1(c) any Contract which shall have been previously rejected by Seller.  Purchaser may remove a Contract from Schedule 2.1(c) through and until the conclusion of the hearing on the assumption and

11

assignment of the Purchased Contracts to Purchaser (the "Assignment Hearing"). To the extent Purchaser seeks to remove a Contract from Schedule 2.1(c) in advance of the Assignment Hearing, Purchaser shall give such notice of the removal of the Contract in writing to Seller. To the extent Purchaser removes a Contract from Schedule 2.1(c) during the Assignment Hearing, counsel for Seller or Purchaser shall give such notice on the record during the Assignment Hearing. Seller, through counsel, hereby agrees to disclose the terms and conditions of this Section 2.1(c) in the Cure Notice (as defined in the Second Modified Procedures Order) and on the record at the beginning of the Assignment Hearing to the extent any counterparty to a Purchased Contract appears at such hearing. There shall be no adjustment in the Purchase Price as a result of Purchaser's election to add or remove a Contract to or from Schedule 2.1(c) or designate any other additional Excluded Assets. Notwithstanding any other provision hereof, the Liabilities of Seller under or related to any Contract or additional Excluded Asset removed or excluded under this Section 2.1(c), or related to any Contract the assumption of which is not approved by the Bankruptcy Court on or prior to the Closing Date, will constitute Excluded Liabilities.

2.2    Excluded Assets. Nothing contained herein shall be deemed to sell, transfer, assign or convey any assets of Seller to Purchaser other than the Purchased Assets (the "Excluded Assets"), and Seller shall retain all right, title and interest to, in and under the Excluded Assets. For the avoidance of doubt, the Excluded Assets, include, without limitation, the following:

(a)    any and all rights of Seller under this Agreement;

(b)    cash and cash equivalents of Debtor;

(c)    accounts receivable of Debtor;

(d)    any and all rights under any Contract of Debtor other than the Purchased Contracts;

(e)    any shares of capital stock or other equity interest of Debtor or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Debtor;

(f)    any minute books, stock ledgers, corporate seals and stock certificates of Debtor, and other similar books and records that Debtor is required by Law to retain or that Seller determines is necessary or advisable to retain, including Tax Returns, financial statements and reports, including, without limitation, individual customer financial and personal information, and corporate or other entity filings;

(g)    any assets of Debtor designated by Purchaser as Excluded Assets pursuant to Section 2.1(c) hereof;

(h)    subject to Section 2.6, any Purchased Contract or Permit that requires the consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained;

12

(i)        refunds, credits and rebates of Taxes;

(j)        except for those rights, claims and causes of action described in <u>Section 2.1(b)(iv)</u>, <u>(b)(v)</u>, <u>(b)(viii)</u>, <u>2.1(b)(ix)</u>, <u>2.1(b)(x)</u>, <u>2.1(b)(xi)</u>, and <u>2.1(b)(xiii)</u> ("<u>Purchaser's Rights</u>"), all rights, claims, and causes of action of Debtor against third parties and the proceeds thereof, including, without limitation, any Avoidance Actions and any Estate Claims;

(k)        any assets, refunds, credits, rebates, contracts or other rights related to any employee benefit plan, program, agreement or arrangement; and

(l)        any assets described on <u>Schedule 1.1(a)</u>.

2.3        <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities (without duplication) existing as of immediately prior to the Closing (collectively, the "<u>Assumed Liabilities</u>") and no others:

(a)        all Liabilities of Debtor under the Purchased Contracts that arise on or after the Closing Date or arise prior to the Closing Date to the extent requiring performance after the Closing Date; and

(b)        subject to <u>Section 2.5</u>, all Cure Amounts associated with the Purchased Contracts.

2.4        <u>Excluded Liabilities</u>.  Purchaser shall not assume and shall be deemed not to have assumed, and Debtor shall be solely and exclusively liable with respect to, each and every Liability of Debtor that is not an Assumed Liability (collectively, the "<u>Excluded Liabilities</u>"). For the avoidance of doubt, the Excluded Liabilities include, without limitation, the following:

(a)        <u>This Agreement</u>:  any of the Liabilities of Seller or Debtor under this Agreement;

(b)        <u>Expenses, Taxes, Etc</u>.:  any of the Liabilities of Seller or Debtor for expenses, Taxes or fees incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement (including, without limitation, any Bankruptcy-Related Fees), the other related agreements or the consummation (or preparation for the consummation) of the transactions contemplated hereby or thereby (including all attorneys' and accountants' fees, and brokerage fees incurred by or imposed upon Seller or Debtor);

(c)        <u>Indebtedness</u>:  any of the Liabilities of Seller or Debtor for any indebtedness or other similar obligations, whether current portion or long term;

(d)        <u>Contracts, Excluded Assets, Etc</u>.:  any Liability of Seller or Debtor under any Contract, commitment, document, license or permit to the extent arising out of a breach or alleged breach thereof that occurred as of or prior to the Closing (other than Cure Amounts associated with Purchased Contracts) and any Liability of Seller or Debtor under any Excluded Asset;

13

(e)     Accounts: any of the Liabilities of Seller or Debtor related to or arising out of individual customer and/or custody accounts;

(f)     Taxes: any Liability of Seller or Debtor with respect to any Taxes;

(g)     Violation of Law: any Liability of Seller or Debtor and/or Seller's or Debtor's directors, officers, employees, stockholders, agents, consultants and advisors to the extent arising by reason of any violation or alleged violation of any Law or any requirement of any Governmental Body (including, without limitation, any Liability of any such Person related to or arising out of any (i) violation or alleged violation of the United States securities laws by such Person and/or (ii) such Person's breach or alleged breach of his, her or its fiduciary duties), or any judgment, order or decree; in any such case to the extent such Liability results from or arises out of events, facts or circumstances occurring or existing on or prior to the Closing, notwithstanding that the date on which any action or claim is commenced or made is after the Closing and irrespective of whether such Liability attaches to Purchaser, on the one hand, or Seller or Debtor, on the other hand, in the first instance;

(h)     Bulk Sales: any Liabilities for which Purchaser may become liable as a result of or in connection with the failure to fully and properly comply with any bulk sales or transfers laws, if any, arising out of Seller's or Debtor's failure to pay any Excluded Liabilities;

(i)     Legal Actions or Proceedings: any Liabilities relating to any legal action or proceeding to the extent arising out of or in connection with (i) Debtor's conduct of the Business prior to the Closing or (ii) any other conduct of Debtor or its officers, directors, employees, stockholders, consultants, agents or advisors in their capacities as such, whether or not disclosed on the Schedules hereto (including, without limitation, any Liability arising out of the alleged fraud of any such Person), in each case, except for any Cure Amounts associated with Purchased Contracts, if any;

(j)     Employees: any Liabilities of Debtor whatsoever related to its employees or consultants, including compensation, bonuses, salary, wages, employee benefit plans, equity or stock options, severance, back pay, or any other item whatsoever related to any past or present employee or consultant of Debtor;

(k)     Worker's Compensation, Injury: any Liability for claims for worker's compensation, injury, disability or death based on an event occurring prior to the Closing Date;

(l)     Liabilities to Affiliates: any Liabilities of Debtor to any Affiliate of Debtor;

(m)     Liabilities of Related Entities of Debtor: except for any Cure Amounts associated with the Purchased Contracts, any Liability of Debtor arising out of the business, assets or operations of any of its Affiliates, whether arising or accruing prior to or after the Closing with respect to facts or events in existence prior to the Closing; and

(n)     Other Liabilities: any other Liability not expressly assumed by Purchaser under Section 2.3 (including any Liabilities arising out of transactions entered into at or prior to the Closing, any action or inaction at or prior to the Closing, any damage, accident, injury or

14

death occurring prior to the Closing or any state of facts to the extent existing at or prior to the Closing, regardless of when asserted, which are not expressly described in Section 2.3).

2.5    Cure Amounts. Purchaser shall assume all Cure Amounts associated with the Purchased Contracts.

2.6    Non-Assignment of Assets. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required. In such event, prior to the Closing, Seller and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as Purchaser may reasonably request.

2.7    Reclamation Claims. The Purchased Assets listed in Schedule 2.7 are subject to reclamation claims as set forth therein. Notwithstanding any provisions of this Agreement to the contrary, such Purchased Assets shall not be transferred to Purchaser in accordance with the terms of this Agreement. Notwithstanding anything to the contrary herein, Purchaser shall not be liable for amounts due in connection with such reclamation claims or related assets.

2.8    Further Conveyances and Assumptions. For a period ending on the earlier of (i) two years from the Closing Date, or (ii) the entry of an order of the Bankruptcy Court closing the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code:

(a)    To the extent permitted by applicable Law, from time to time following the Closing, Seller shall make available to Purchaser such non-confidential data in personnel records of Key Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, Seller and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby.

(c)    For the purpose of (i) collecting all Purchased Assets (including any Affected Equipment), (ii) instituting and prosecuting all proceedings which Purchaser may deem proper in order to collect, assert or enforce any claim, right or title in or to the Purchased Assets, (iii) defending and compromising all actions, suits or proceedings with respect to any of the Purchased Assets, and (iv) doing all such reasonable acts and things with respect to the Purchased Assets as Purchaser may deem advisable, Seller shall, at its option (such option to be

exercised promptly upon request of the Purchaser in accordance with Section 11.9, but in no event later than five (5) Business Days from the date of such request), either (x) execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments at Purchaser's request, and take such further actions at Purchaser's request (in each case, such request to be given in accordance with Section 11.9) , as may be reasonably necessary or appropriate, or (y) execute, acknowledge and deliver to Purchaser an instrument, reasonably acceptable to Purchaser and Seller, appointing Purchaser its successors and assigns the true and lawful attorney of Seller with full power of substitution, in the name of Seller, on behalf of and for the Purchaser at Purchaser's sole cost and expense.

## ARTICLE III
## CONSIDERATION

3.1     Consideration.  The aggregate consideration for the Purchased Assets shall be $3,000,000.00 (the "Cash Consideration") plus the assumption of the Assumed Liabilities (if any) (together, the "Purchase Price"), which shall consist of:

(a)     a cash payment equal to the amount by which the Cash Consideration exceeds the Deposit Amount payable by Purchaser (or its designee) at Closing by wire transfer of immediately available funds to an account of Seller designated to Purchaser by Seller prior to Closing;

(b)     the Deposit Amount (as defined below); and

(c)     the assumption by Purchaser of the Assumed Liabilities, if any.

3.2     Purchase Price Deposit.  Pursuant to the terms of an escrow agreement in the form attached hereto as Exhibit B (the "Escrow Agreement"), Purchaser has deposited on January 25, 2010 the sum of $150,000.00 by wire transfer of immediately available funds (the "Deposit Amount") with the escrow agent under the Escrow Agreement (the "Escrow Agent"); provided that by 5:00 p.m., Chicago time on the first Business Day after the date of entry of the Sale Order, Purchaser shall deposit an additional $350,000 with the Escrow Agent under the Escrow Agreement and such amount, along with the amount Purchaser has deposited on January 25, 2010, shall thereafter be the Deposit Amount. The Deposit Amount (together with all accrued investment income thereon) shall be released by the Escrow Agent and delivered to either Purchaser or Seller as follows:

(a)     if the Closing occurs, the Deposit Amount and all accrued investment income thereon shall be applied towards the Purchase Price;

(b)     if this Agreement is terminated by Sellers pursuant to Section 4.2(d) or Section 4.2(f), then the Deposit Amount and all accrued investment income thereon shall be delivered to Seller; or

(c)     if this Agreement is terminated for any reason other than by Seller pursuant to Section 4.2(d) or Section 4.2(f), the Deposit amount and all accrued investment income thereon shall be returned to Purchaser.

CHI 11896983.5

## ARTICLE IV
## CLOSING AND TERMINATION

4.1     Closing Date. Subject to the satisfaction of the conditions set forth in Sections 9.1 and 9.2 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Seyfarth Shaw LLP, 131 S. Dearborn Street, Suite 2400, Chicago, Illinois 60603 (or at such other place as the parties may designate in writing) at 10:00 a.m. (Chicago time) on the first Business Day following the day on which the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing but subject to the satisfaction or waiver of such conditions) are satisfied (the "Closing Conditions"), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

(a)     By Seller. At the Closing, Seller shall deliver a copy of the source code to the Purchased Intellectual Property as set forth on Schedule 4.1(a) and shall deliver or make available to Purchaser the Purchased Assets, free and clear of any Liens, along with, as applicable:

(i)     a Bill of Sale substantially in the form of Exhibit C hereto (the "Bill of Sale") executed by Seller;

(ii)     a counterpart of an Assignment and Assumption Agreement substantially in the form of Exhibit D (the "Assignment and Assumption Agreement") duly executed by Seller;

(iii)     an assignment of Intellectual Property assigning, transferring, and conveying all of Debtor's right, title, and interest in and to the Purchased Intellectual Property, duly executed by Seller, to be in form and substance customary to transactions of this nature and reasonably agreed to by the Parties (the "Assignment of Intellectual Property");

(iv)     an assignment of domain names, duly executed by Seller, to be in form and substance customary to transactions of this nature and reasonably agreed to by the Parties (the "Domain Name Assignment");

(v)     such other good and sufficient customary instruments of conveyance, assignment, and transfer, in form and substance satisfactory to Purchaser, as shall be effective to vest in Purchaser all right, title, and interest in and to the Purchased Assets;

(vi)     a good standing certificate of Debtor certified to by the appropriate governmental agency within the state of Debtor's formation;

(vii)     the Necessary Consents, to the extent available;

(viii)     the certificate provided for in Section 9.1(b); and

(ix)     a copy of the Certificate of Merger.

17

Notwithstanding the foregoing, the Parties agree that (A) Seller may retain certain equipment, as indicated on Schedule 2.1(b)(iii), until February 28, 2010 and (B) to the extent Seller is compelled to produce or turnover any of the equipment listed on Schedule 2.1(b)(iii) to any Governmental Body (by power of subpoena or otherwise) (collectively, the "Affected Equipment"), then (x) the Affected Equipment shall be considered transferred to Purchaser, and, following its use by such Governmental Body, shall be deliverable to Purchaser, (y) neither Seller nor Debtor shall have any obligation to convey or provide access to such Affected Equipment to Purchaser while in the possession or control of such Governmental Body, and (z) the inability of Seller or Debtor to provide Purchaser with the Affected Equipment shall not result in any adjustment to the Purchase Price.

(b)    By Purchaser.  At the Closing, Purchaser shall deliver to Seller the following:

(i)    the Cash Consideration;

(ii)    a counterpart of the Assignment and Assumption Agreement;

(iii)    a counterpart of the Assignment of Intangible Property, duly executed by Purchaser;

(iv)    a counterpart of the Domain Name Assignment; duly executed by Purchaser;

(v)    the certificate provided for in Section 9.2(b).

4.2    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)    by Purchaser or Seller, if the Closing shall not have occurred by the close of business on the day which is sixteen (16) days after the date the Sale Order is entered, or the first Business Day thereafter, if such day is not a Business Day (the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to the fault of a party hereto to perform its obligations under this Agreement, then the breaching party may not terminate this Agreement pursuant to this Section 4.2(a);

(b)    by mutual written consent of Seller and Purchaser;

(c)    by Purchaser, if any condition to the obligations of Purchaser set forth in Section 9.1 shall have become incapable of fulfillment prior to the Termination Date other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(d)    by Seller, if any condition to the obligations of Seller set forth in Section 9.2 shall have become incapable of fulfillment prior to the Termination Date other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

18

(e)    by Purchaser, if there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.1 and which breach has not been cured by the earlier of (i) 5 Business Days after the giving of written notice by Purchaser to Seller of such breach and (ii) the Termination Date;

(f)    by Seller, if (i) there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 9.2 and which breach has not been cured by the earlier of (a) 5 Business Days after the giving of written notice by Trustee to Purchaser of such breach and (b) the Termination Date, or (ii) there shall be a breach by Purchaser of its obligation to post the Deposit Amount in accordance with Section 3.2;

(g)    by Seller or Purchaser if there shall be in effect an Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(h)    by Purchaser or Seller, if Seller shall enter into a Contract with respect to a Competing Transaction or if the Bankruptcy Court shall enter an order approving a Competing Transaction;

(i)    automatically, if Seller consummates a Competing Transaction;

(j)    by Purchaser, if (i) Trustee has not selected Purchaser as the Successful Bidder or the Backup Bidder (as defined in the Second Modified Procedures Order) at the Auction by February 4, 2010; or (ii) if the Bankruptcy Case is dismissed;

(k)    by Purchaser, if the Sale Order is not entered on or before February 10, 2010; or

(l)    by Purchaser if the CareGain Merger shall not have occurred prior to the Closing.

4.3    Procedure Upon Termination.  In the event of termination pursuant to Section 4.2 hereof, written notice thereof shall forthwith be given to the other party, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.4    Effect of Termination.  In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that the obligations of the parties set forth in the Escrow Agreement and in Sections 3.2, 4.4, 7.3, 8.1 and the provisions of Article XI hereof

19

shall survive any such termination and shall be enforceable hereunder; provided further, however, that nothing in this Section 4.4 shall be deemed to release any party from liability for any breach of its obligations under this Agreement.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller, for and on behalf of Debtor, hereby represents and warrants to Purchaser that:

5.1    Organization and Good Standing.  Debtor is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and, subject to the limitations imposed on Debtor as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2    Authorization of Agreement.  Subject to entry of the Sale Order, the Assignment Order, and such other authorization as is required by the Bankruptcy Court, Seller has the requisite authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  Subject to entry of the Sale Order, the Assignment Order, and such other authorization as is required by the Bankruptcy Court, the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by Seller.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto, the entry of the Sale Order and the Assignment Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 5.3(a), the execution and delivery by Seller of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Seller with any of the provisions hereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Debtor; (ii) subject to entry of the Sale Order and the Assignment Order, any Purchased Contract or Permit (other than those applicable to Excluded Assets) to which Seller is a party or by which any of the properties or assets of Debtor are bound; (iii) subject to entry of the Sale Order and the Assignment Order, any Order of any Governmental Body applicable to Seller or any of the properties or assets of Debtor as of the date hereof; or (iv) assuming that Necessary Consents have been obtained, any applicable Law as

20

of the date hereof, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)    Except as set forth on Schedule 5.3(b) and except to the extent not required if the Sale Order is entered, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order and the Assignment Order, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.4    Title to Purchased Assets.  Except as set forth on Schedule 5.4, Debtor owns and holds good title to the Purchased Assets.  Subject to the entry of the Sale Order and the Assignment Order and except as set forth on Schedule 5.4, Purchaser will be vested with good title to the Purchased Assets, free and clear of all Liens (other than those created by Purchaser claims or interests) to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

5.5    Intellectual Property.

(a)    Schedule 5.5(a) sets forth a list of all Debtor Owned IP (as hereinafter defined) issued by or registered with a Governmental Body (including, without limitation, the United States Patent and Trademark Office, the United States Copyright Office, or their foreign equivalents), including domain names, in each case that are owned by or issued to Debtor ("Debtor Registered IP").

(b)    Except as set forth on Schedule 5.5(b), Debtor owns each item of Debtor Owned IP free and clear of any Lien.  All Purchased Intellectual Property owned by Debtor is referred to herein as "Debtor Owned IP".  All Intellectual Property licensed by Debtor is referred to herein as "Debtor Licensed IP".

(c)    Except as set forth on Schedule 5.5(c):

(i)    to the Knowledge of Seller, no third party is infringing, misappropriating, or otherwise violating Debtor's rights in any of the Debtor Owned IP and no claim against a third party with respect to the alleged infringement or misappropriation of the Debtor Owned IP is currently pending or threatened,

(ii)    no claim by Debtor against a third party with respect to any alleged infringement or misappropriation of the Debtor Owned IP is currently pending or threatened,

21

(iii)   there is no claim pending or, to the Knowledge of Seller, threatened against Debtor with respect to any alleged infringement, misappropriation, or violation by Debtor or any Debtor Owned IP of any Intellectual Property rights of any third party,

(iv)   no litigation is pending wherein Debtor or any Debtor Owned IP is alleged to infringe, misappropriate, or violate any Intellectual Property right of any third party, and

(v)   to the Knowledge of Seller, the conduct of the Business by Debtor does not violate, interfere with, infringe upon or misappropriate any Intellectual Property rights of any Person.

(d)   Except as set forth on Schedule 5.5(d): No Debtor Owned IP is subject to any existing challenge, proceeding or outstanding decree, order, judgment, agreement or stipulation restricting in any manner the use, transfer or licensing thereof by the Seller, or which may affect the validity, use or enforceability of the Debtor Owned IP. All necessary registration, maintenance and renewal fees currently due in connection with Debtor Registered IP have been paid and all necessary documents, recordations and certifications in connection with such Debtor Registered IP have been filed with the relevant patent, copyright, trademark or other authority in the United States or foreign jurisdictions, as the case may be, for the purpose of maintaining such Debtor Registered IP and maintaining Debtor's interest in and to the same, where the failure to maintain the same would have a Seller Material Adverse Effect.

(e)   Debtor has taken commercially reasonable steps to protect the rights of Debtor in its Confidential Information and any trade secret or confidential information of third parties used in the business of Debtor, and, without limiting the generality of the foregoing, the Debtor has enforced a policy requiring each employee and independent contractor to execute a proprietary information/confidentiality agreement, and, except under confidentiality obligations, there has not been any disclosure by the Seller or Debtor of any Confidential Information, where such disclosure would have a material adverse effect on the Purchased Assets.

(f)   Schedule 5.5(f)(i) sets forth a complete list of the Software owned by Debtor and included in the Purchased Intellectual Property (the "Debtor Proprietary Software") by title, version number and publication date (if any), and Schedule 5.5(f)(ii) sets forth a list of all material Software (other than Debtor Proprietary Software) licensed to Debtor and required to use the Software Platforms, by title, version number, and licensor name.

(g)   The Debtor Proprietary Software was: (i) developed by Debtor's employees working within the scope of their employment at the time of such development; (ii) developed by agents, consultants, contractors or others who have executed appropriate instruments of assignment in favor of Debtor as assignee to convey to Debtor ownership of the Intellectual Property rights in the Debtor Proprietary Software; or (iii) acquired by Debtor in connection with acquisitions in which the Debtor obtained appropriate representations, warranties and indemnities from the transferring party relating to the title to the Debtor Proprietary Software. Except as provided in Schedule 5.5(g), Seller has not received any notice

22

from any Person claiming, and, to the Knowledge of Seller, no Person other than Debtor and its licensees possesses, any right, title or interest in or to the Debtor Proprietary Software.

(h)    The use, display, performance, reproduction and distribution of the Debtor Proprietary Software has not and does not infringe or misappropriate the Intellectual Property rights of any third party and does not breach any terms of any license or other contract between Debtor and any third party.  Except as provided in Schedule 5.5(h), Seller has not granted ownership rights in the Debtor Proprietary Software to any Person.

(i)    Except as set forth on Schedule 5.5(i), the source code for the Debtor Proprietary Software has been maintained in confidence, has not been placed into escrow for the benefit of any Person other than Debtor and is not otherwise subject to any obligation that requires or permits, or which upon the giving of notice or the passage of time or both would require or permit, its disclosure to a third party.

(j)    Except as set forth on Schedule 5.5(j), to the Knowledge of Seller, no Debtor Owned IP (A) contains any Malware, (B) contains any code or instructions which would have the effect of shutting down, adversely affecting, impairing, or denying access to all or a portion of such Debtor Owned IP, or any systems, databases, software or hardware used in connection with such Debtor Owned IP, or erasing or destroying any data of the users of such Debtor Owned IP or such user's licensees or its and their employees, customers or clients in any manner, without the authorization of the administrator thereof and (C) is subject, in whole or in part, in any way, to the terms of any "open source," "copyleft" or other similar license (including, without limitation, any GNU, Mozilla, Berkeley, Open Source, MIT or Apache licenses and any license that would require its source code to be publicly distributed in either whole or part) or any other distribution model that could subject Purchaser's use, modification, distribution or licensing of any Debtor Owned IP in the manner in which Debtor used, modified, distributed or licensed such Debtor Owned IP in its conduct of the Business prior to the Closing to the condition that such Debtor Owned IP be distributed in source code form or that such Debtor Owned IP be licensed to third parties for free.

5.6    Validity of Contracts.  Except as set forth on Schedule 5.6 and subject to the entry of the Sale Order, the Assignment Order and such other authorization as is required by the Bankruptcy Court, each Purchased Contract to which Debtor is a party or is otherwise obligated is a valid and binding obligation of Debtor and, to the Knowledge of Seller, the other parties thereto in accordance with its terms and conditions, except as such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity).  Except as set forth on Schedule 5.6, no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any Purchased Contract by Debtor or would cause the acceleration of any obligation of Debtor under such Purchased Contract or, to the Knowledge of Seller, any other party thereto or the creation of a Lien upon any Purchased Asset, except for such events that (i) will be cured in accordance with the Second Modified Procedures Order, the Sale Order, the Assignment Order or such other authorization as is required by the Bankruptcy Court and/or (ii) would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

23

5.7     <u>Financial Advisors</u>.  Except as set forth on <u>Schedule 5.7</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transactions contemplated by this Agreement.  No Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.  For any Person listed on <u>Schedule 5.7</u>, the Schedule sets forth the amount payable to such Person as a result of the transactions contemplated herein.

5.8     <u>Absence of Changes</u>.  Except as set forth on <u>Schedule 5.8</u>, since the Petition Date there has not been any event, change, occurrence or circumstance that, individually or in the aggregate with any other event, change, occurrence or circumstance, has had or would reasonably be expected to have a Seller Material Adverse Effect.

5.9     <u>Notice of Sale and Auction</u>.  In connection with obtaining approval of the Sale Order and in compliance with the procedures set forth in the Original Procedures Order, the Modified Procedures Order and the Second Modified Procedures Order, (a) Debtor served copies of the Original Procedures Order and the Auction Notice (as defined in the Original Procedures Order) on certain parties set forth in its certificate of service (Dkt. No. 85. in the Bankruptcy Case), (b) Debtor provided notice by publication in the Chicago Tribune on Thursday, December 31, 2009 in the form attached as Exhibit A to Debtor's Certificate of Service by Publication (Dkt. No. 96 in the Bankruptcy Case), (c) Trustee served a copy of the Modified Procedures Order on certain parties set forth in his certificate of service (Dkt. No. 119 in the Bankruptcy Case), and (d) Trustee served a copy of the Second Modified Procedures Order on certain parties set forth in his certificate of service (Dkt. No. 150 in the Bankruptcy Case).

5.10    <u>Limitations of Representations and Warranties</u>.  EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE V, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, THE BUSINESS OR OTHERWISE.  ALL OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY DISCLAIMED.  EXCEPT TO THE EXTENT SPECIFICALLY SET FORTH IN THIS ARTICLE V, SELLER IS SELLING, ASSIGNING AND TRANSFERRING THE PURCHASED ASSETS TO PURCHASER ON AN "AS-IS, WHERE-IS" BASIS.

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to Seller that:

6.1     <u>Organization and Good Standing</u>.  Purchaser is an entity duly organized, validly existing and in good standing under the laws of the state of Delaware and has the requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2     <u>Authorization of Agreement</u>.  Purchaser has the requisite limited liability company power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each

24

other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Purchaser. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against each such entity in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     Conflicts; Consents of Third Parties.

(a)     The execution and delivery by Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Purchaser; (ii) any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound; (iii) any Order of any Governmental Body applicable to Purchaser or any of the properties or assets of Purchaser as of the date hereof; or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by Purchaser of any other action contemplated hereby or thereby, except for such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.4     Litigation. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

CHI 11896983.5

6.5    Financial Capability.  Purchaser will have at the Closing sufficient funds available to pay the amount of the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement.  Purchaser acknowledges and agrees that this transaction is not contingent on the receipt of any financing by Purchaser.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

7.1    Bankruptcy Court Filings.  Subject to Section 7.2, Trustee shall pursue diligently the entry of the Sale Order and the Assignment Order.  Trustee shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the Sale Order and the Assignment Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Trustee to assist in obtaining entry of the Sale Order and the Assignment Order and a finding of adequate assurance of future performance by Purchaser with respect to any Purchased Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the Sale Order or the Assignment Order is appealed, Trustee and Purchaser, as appropriate, shall use their respective commercially reasonable efforts to defend such appeal.

7.2    Competing Transactions.  Following the date hereof, so long as Purchaser is in compliance with its obligations under this Agreement and Seller has no reasonable basis for believing that Purchaser will not comply with such obligations, Trustee (a) will not participate in any discussions with, or furnish any information to, any Person with respect to any Competing Transaction regardless of the terms thereof and (b) will not, and will not permit any of his representatives or agents (collectively, the "Representatives") directly or indirectly, to (i) discuss, encourage, facilitate, negotiate, undertake, initiate, solicit, authorize, propose or enter into a Competing Transaction or (ii) furnish or caused to be furnished, to any Person, any information covering the business, properties or assets of Debtor in connection with a Competing Transaction, except, in either case pursuant to negotiations with the creditors of Debtor.

7.3    Escrow Agreement.  If this Agreement is terminated pursuant to any subparagraph of Section 4.2, Seller and Purchaser shall furnish to the Escrow Agent joint written instructions to such effect, as provided in Section 3 of the Escrow Agreement.

## ARTICLE VIII
## COVENANTS

8.1    Confidentiality.

(a)    Except as required by applicable law, in connection with the Auction or as approved by the Bankruptcy Court, Seller shall not, and Seller shall advise his Representatives (and the Debtor's directors, officers, employees representatives or agents) not to, directly or indirectly:

CH1 11896983.5

(i)      from and after the date hereof, disclose to any Person, firm, corporation or other business entity any Confidential Information for any reason or purpose whatsoever;

(ii)      from and after the Closing, make use of any Confidential Information for their own purpose or for the benefit of any Person (other than Purchaser); or

(iii)      from and after the date hereof, make any statements, observations or opinions or communicate any information (whether oral or written) that disparages or would reasonably be expected to harm the reputation of the Business or Purchaser;

*provided, however,* that the restrictions in this Section 8.1(a) shall terminate on the second anniversary of the Closing with respect to any Confidential Information that does not then constitute a trade secret under applicable law. Nothing in this Section 8.1 shall be construed to limit or supersede the common law of torts or statutory or other protection of trade secrets where such law provides Purchaser with greater or longer protection than provided in this Section 8.1.

(b)      The obligations set forth in Section 8.1(a) shall not apply to any information that Seller can demonstrate has become generally available to the public through no act or omission of Seller or his Representatives and without violation of this Agreement, or any other confidentiality obligation of Seller. If Seller or any of his Representatives are requested pursuant to, or required by, applicable law, regulation or a duly authorized subpoena, court order, or government authority to disclose any of the Confidential Information, Seller will notify Purchaser promptly so that Purchaser may seek a protective order or other appropriate remedy. Seller shall, and shall cause his Representatives to, cooperate in all reasonable respects with Purchaser's efforts in connection with the foregoing purpose. If no such protective order or other remedy is obtained, Seller will furnish only that portion of the Confidential Information which Seller is advised by counsel is legally required to be furnished and will use his commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the furnished Confidential Information.

(c)      The parties recognize and agree that in the event of a breach or threatened breach of Section 8.1(a) by Seller or his Representatives, money damages would not be an adequate remedy to Purchaser for such breach and, even if money damages were adequate, it would be difficult to ascertain or measure with any degree of accuracy the damages sustained by Purchaser therefrom. Accordingly, if there should be a breach or threatened breach of the provisions of Section 8.1(a), Purchaser shall be entitled to an injunction restraining any such breach. Nothing in the preceding sentence shall limit or otherwise affect any remedies that Purchaser or its Affiliates may otherwise have under applicable law.

(d)      All of the covenants in Section 8.1(a) are intended by each party to be, and shall be construed as, agreements independent of any other provision in this Agreement, and the existence of any claim or cause of action of Seller against Purchaser, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by Purchaser of any covenant in Section 8.1(a). The parties agree that Section 8.1 is a material and substantial part of the transactions contemplated hereby.

27

8.2    Access to Information.  Seller agrees that, prior to the Closing Date and subject to reasonable restrictions imposed from time to time upon advice of counsel respecting any applicable confidentiality agreement with any Person (provided that the Seller shall use his commercially reasonable efforts to obtain waivers under such agreements or implement requisite procedures to enable provision of reasonable access without violating such agreement), Purchaser shall be entitled, following notice from Purchaser to Seller in accordance with Section 11.9, through its officers, employees, consultants and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of Debtor and the Business and such examination of the books and records of Debtor and the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.  Seller, to the extent feasible shall cause his Representatives and Debtor's officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and his Representatives and shall use their commercially reasonable efforts to minimize any disruption to the Business.  For the avoidance of doubt, Purchaser and its representatives and Affiliates are hereby authorized to contact Debtor's employees, vendors, lenders and/or customers only in connection with and for the purpose of conducting Purchaser's due diligence investigation without further consent of Seller.

8.3    Conduct of the Business Pending the Closing.

(a)    Except (i) as otherwise set forth on Schedule 8.3(a), (ii) as required by applicable Law or required, authorized or restricted pursuant to an Order of the Bankruptcy Court, (iii) as otherwise expressly contemplated by this Agreement, or (iv) with the prior written consent of Purchaser and the approval of the Bankruptcy Court after notice and hearing, during the period from the date of this Agreement to and through the Closing Date, Seller shall use his commercially reasonable efforts to preserve and protect the Purchased Intellectual Property (including, without limitation, all source code underlying the Software comprising Purchased Intellectual Property).

(b)    Except (i) as otherwise set forth on Schedule 8.3(b), (ii) as required by applicable Law, (iii) as otherwise contemplated by this Agreement, or (iv) with the prior written consent of Purchaser and the approval of the Bankruptcy Court after notice and hearing, Seller shall not:

(i)    subject any of the Purchased Assets to any Lien, except for existing Liens;

(ii)    other than in the Ordinary Course of Business, acquire any material properties or assets that would be Purchased Assets or sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets;

28

(iii)    cancel or compromise any material claim or waive or release any material right of Seller that constitutes a Purchased Asset;

(iv)    modify or reject any Purchased Contract; or

(v)    agree to do anything prohibited by this <u>Section 8.3</u> or do or agree to do anything that would cause Seller's representations and warranties herein to be false in any material respect.

8.4    <u>Consents</u>.  Until the Closing, Seller shall use his commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all Necessary Consents; <u>provided, however,</u> that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

8.5    <u>Further Assurances</u>.  Subject to the other provisions of this Agreement, each of Purchaser and Seller shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

8.6    <u>Preservation of Records</u>.  Seller and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for the longer of (i) a period of two (2) years from the Closing Date (except as provided below) and (ii) the period from the Closing Date through the date of entry of an Order of the Bankruptcy Court closing the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code, and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby.  In the event Seller or Purchaser wishes to destroy such records before or after that time, such party shall first give 90 days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such 90 day period, to take possession of the records within 180 days after the date of such notice. With respect to any litigation and/or claims that are not Assumed Liabilities, Purchaser shall, at Seller's cost, render all reasonable assistance that Seller may request in defending such litigation or claim and shall make available to Seller personnel most knowledgeable about the matter in question.  If after the Closing, Purchaser (or any Affiliate or creditor of Purchaser) receives any payment or revenue that belongs to Seller pursuant to this Agreement, Purchaser shall promptly remit or caused to be remitted the same to Seller.  If after the Closing, Seller receives any payment or revenue that belongs to Purchaser pursuant to this Agreement, such Seller shall promptly remit or cause to be remitted the same to Purchaser.

8.7    <u>Publicity</u>.  None of the parties hereto shall issue any press release concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in

29

the sole judgment of Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that Seller shall use his commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser with respect to the text thereof.

8.8    Supplementation and Amendment of Schedules. Seller may, at its option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule to which its relevance is reasonably apparent on its face. From time to time prior to the Closing, Seller shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement. No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in Section 9.1(a) or cure any breach of this Agreement; provided, however, if the Closing shall occur, then Purchaser shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise with respect to any and all matters disclosed pursuant to any such supplement or amendment at or prior to the Closing.

8.9    Post-Closing Use of Names. After the Closing, Seller shall not use commercially any tradename of Debtor that is a Purchased Asset.

8.10    Certain Matters Relating to Employees. Seller will make available to Purchaser, as reasonably requested by Purchaser, data about the compensation, employment benefits, length of service, and recent performance history of employees of Debtor or its Affiliates who are employed in the Business and Seller will permit and will not interfere with Purchaser's contact and negotiations with employees and/or independent contractors for the purpose of determining whether Purchaser shall offer employment to such employees and/or independent contractors of Debtor, provided such contact and negotiation does not interfere with the conduct of the Business. Purchaser may, but shall not be obligated to, offer employment or engagement to any or all of the employees and independent contractors of Debtor, but it is understood and agreed that Purchaser will offer employment to those employees of Debtor identified in writing by Purchaser to Debtor prior to the Closing and that Seller shall terminate those employees at Closing. Any employment offered by Purchaser will be "at will," on such terms as may be agreed by Purchaser and such individual. For the avoidance of doubt, Purchaser will not assume or continue, or have any responsibility or Liability to any employee or independent contractor of Debtor with respect to any Liabilities owed thereto by Debtor.

8.11    Other Agreements. Other than filing the Petition and proceeding with the Bankruptcy Case, Seller shall not take any action, directly or indirectly, that is designed or intended to have the effect of discouraging any subscriber, lessor, licensor, customer, supplier, or other business associate of Debtor from maintaining the same business relationships with Purchaser after the Closing as it maintained with the Business prior to the Closing. To the extent practicable, Seller will refer all customer inquiries relating to the Purchased Assets to Purchaser from and after the Closing.

30

8.12    Obligations of Purchaser. If Seller and/or Debtor incur(s) any losses as a result of Purchaser's breach of or failure to perform any of its representations or warranties or any covenant or obligation under this Agreement, and Purchaser is found or held to be liable to the Seller and/or the Debtor for such losses, Parent shall be jointly and severally liable with Purchaser to Seller and/or Debtor, as applicable, for such losses up to an aggregate amount not to exceed the lesser of (i) the amount of such losses and (ii) the amount of the Cash Consideration.

## ARTICLE IX
## CONDITIONS TO CLOSING

9.1    Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Seller contained in this Agreement that are not qualified by materiality or Seller Material Adverse Effect shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Seller contained in this Agreement that are qualified by materiality or Seller Material Adverse Effect shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Purchaser shall have received a certificate signed by Seller, dated the Closing Date, to the foregoing effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by Seller, dated the Closing Date, to the forgoing effect;

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.1(a);

(d)    between the date hereof and the Closing Date, there shall not have occurred any Seller Material Adverse Effect;

(e)    the Bankruptcy Court shall have entered the Sale Order and the Sale Order has become a Final Order;

(f)    Debtor shall have retained a sufficient number of Key Employees to adequately maintain the Software Platforms and shall have delivered evidence of such retention to Purchaser;

(g)    The CareGain Merger shall have occurred.

9.2    Conditions Precedent to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

31